UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CENTER FOR BIOLOGICAL DIVERSITY,

              Plaintiff,

    v.

U.S. ARMY CORPS OF ENGINEERS;
LIEUTENANT GENERAL SCOTT A.
SPELLMON, Commanding General, Army
Corps of Engineers; WYNN COGGINS,
Acting Head of Commerce; and NATIONAL
MARINE FISHERIES SERVICE,

              Defendants.

Case No. 2:21-cv-00275

COMPLAINT

## INTRODUCTION

1.      Southern Resident killer whales are one of the most endangered marine mammals in the world. They have suffered an alarming decline toward extinction, with only 74 remaining today. They are threatened by starvation from lack of salmon prey; vessel noise and disturbance that interfere with essential behaviors; and contaminants that accumulate in their bodies.

2.      This case challenges the failure of the U.S. Army Corps of Engineers (Corps) and the National Marine Fisheries Service (Fisheries Service) to fully disclose and evaluate the harm to Southern Resident killer whales from the Corps' decision to expand Seattle Harbor. The Corps

and the Fisheries Service are in violation of the Endangered Species Act, National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA) because of their decisions related to the Seattle Harbor Navigation Improvement Project (the "Seattle Harbor Project" or "project").

3.      The Corps is planning a massive, multi-year project to expand the east and west waterways of Seattle Harbor to facilitate huge new container ships. The Corps will remove 1,112,000 cubic yards of material from the waterways—enough to fill 300 Olympic-size swimming pools—nearly a quarter of which has toxic or hazardous contaminants. The Corps concluded that the project would have no significant environmental impact. The Fisheries Service found that the project is not likely to adversely affect endangered Southern Resident killer whales or critical habitat.

4.      To the contrary, the project contributes to each of the primary threats to endangered killer whales. Deepening the harbor will increase mega-ships transiting through the critical habitat of Southern Resident killer whales, dredge up hazardous and toxic contaminants, deposit spoils in critical habitat, and pollute waters that salmon and killer whales inhabit.

5.      The Corps' project endangers Southern Resident killer whales, and it will deepen their risk of extinction. Yet, the Corps and the Fisheries Service completely ignored the harms that expanding the Seattle Harbor will have on endangered killer whales. The Corps failed to take a hard look at the numerous significant impacts that could result from the project as NEPA requires. The Fisheries Service failed to properly analyze the impacts of the project on endangered Southern Resident killer whales as the Endangered Species Act requires.

6.      Given these dangers to killer whales, the Corps' Finding of No Significant Impact, flawed Environmental Assessment, and failure to prepare a comprehensive environmental impact statement violate NEPA. The Fisheries Service's determination that the project is not likely to adversely affect critically endangered Southern Resident killer whales violates the Endangered

Species Act. The Corps' reliance on the Fisheries Service's flawed decision violates the Endangered Species Act. Both the Fisheries Service's and the Corps' failure to reinitiate and complete consultation on the impacts of the project on Southern Resident killer whales and their critical habitat violates the Endangered Species Act.

7. Accordingly, Plaintiff Center for Biological Diversity seeks an order from this Court vacating the Corps' and the Fisheries Service's invalid environmental documents and ordering the agencies to prepare revised documents, including a full environmental impact statement and biological opinion, that consider a broad range of mitigation to protect the endangered killer whales.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States) and 28 U.S.C. § 1346 (actions against the United States). An actual, justiciable controversy now exists between Plaintiff and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201–02. Judicial review is available under the APA and Endangered Species Act. 5 U.S.C. §§ 701–06; 16 U.S.C. § 1540(g).

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the events and omissions giving rise to Plaintiff's claims occurred in this district.

10. Pursuant to 16 U.S.C. § 1540(g)(2)(A), Plaintiff provided the Corps and Fisheries Service with notice of their Endangered Species Act violations more than 60 days prior to the commencement of this case.

## INTRADISTRICT ASSIGNMENT

11. Pursuant to Civil Local Rule 3(e), this action is properly assigned to the Seattle Division of this district because a substantial part of the events or omissions giving rise to

1    Plaintiff's claims occurred in King County and Defendant Corps of Engineers maintains a Seattle

2    office in King County.

3                                            **PARTIES**

4         12.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a nonprofit corporation

5    that advocates for the protection of threatened and endangered species and their habitats through

6    science, policy, and environmental law. The Center's Oceans Program focuses specifically on

7    conserving marine wildlife and habitat. In pursuit of this mission, the Center has been actively

8    involved in securing protections for imperiled marine animals, including Southern Resident killer

9    whales. In 2001, the Center filed a petition to list Southern Resident killer whales as an endangered

10   species under the Endangered Species Act, and through legal action it secured such protections for

11   this population. The Center also has engaged in longstanding efforts to protect the habitat of

12   Southern Resident killer whales from water and noise pollution, disturbance from vessels, and

13   other threats.

14        13.    The Center has more than 84,300 members, many of whom live on the U.S. West

15   Coast. The Center brings this action on behalf of itself and its members. Center members and staff

16   live near and regularly visit the inland waters and coastal habitat of Southern Resident killer whales

17   to observe, photograph, study, and otherwise enjoy Southern Resident killer whales and their

18   habitat. Center members have an interest in Southern Resident killer whales and their habitat,

19   including waters around the Seattle Harbor, Elliot Bay, Puget Sound, and along the Pacific Coast.

20   For example, Center members regularly walk, sail, kayak, and go whale watching to enjoy the

21   marine habitat and look for and photograph Southern Resident killer whales. Center members and

22   staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from

23   the presence of Southern Resident killer whales and their habitat. Center members and staff intend

24

1    to continue to frequently engage in these activities and to use and enjoy Southern Resident killer

2    whales' habitat in the future.

3        14.    The Center and its members visit areas affected by the Seattle Harbor Project. The

4    project threatens Southern Resident killer whales with increased vessel traffic, and pollution, and

5    degradation of their habitat. The Center and its members are harmed by the Corps' and Fisheries

6    Service's inadequate Endangered Species Act analysis, Environmental Assessment, and Finding

7    of No Significant Impact. The Center and its members are also harmed by the Corps' failure to

8    prepare a comprehensive Environmental Impact Statement and its failure to reinitiate and complete

9    consultation. The failure to comply with applicable environmental laws deprives endangered killer

10   whales of additional statutory protections that are vitally important to the species' survival and

11   eventual recovery. The Fisheries Service and Corps' failures diminish the aesthetic, recreational,

12   spiritual, scientific, and other interests of the Center and its members, because without conducting

13   the careful analyses these laws demand, Southern Resident killer whales are more vulnerable to

14   the impacts of insufficient prey availability, vessel disturbance, and pollution.

15       15.    Additionally, part of NEPA's purpose is to ensure that federal agencies fully

16   disclose to the public and decisionmakers the environmental damage that an action will cause and

17   evaluate alternatives that will mitigate those impacts. The Center and its members have suffered

18   procedural and informational harms guaranteed to them by the Endangered Species Act and

19   NEPA. It is unlikely that the project would be redesigned, withdrawn, mitigated, or carried out in

20   a manner that protects Southern Resident killer whales absent a meaningful environmental review

21   that complies with the Endangered Species Act and NEPA.

22       16.    The relief sought in this case will redress these injuries. Preparation and completion

23   of a comprehensive review under NEPA will ensure the Fisheries Service and the Corps consider

24   and make public the true environmental effects of the Seattle Harbor Project and consider a

COMPLAINT
Case No. 2:21-CV-00275

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146; Seattle, WA 98117
(206) 900-7953

reasonable range of alternatives that would better protect Southern Resident killer whales. Reinitiation and completion of consultation will ensure that the Fisheries Service and Corps consider and make public the best available science in determining whether their actions are likely to jeopardize the continued existence of the endangered Southern Resident killer whales or result in the destruction or adverse modification of their critical habitat. Through these processes, the Fisheries Service and Corps can assess the effects of the Seattle Harbor Project on Southern Resident killer whales and avoid dangers from ship traffic, pollution, and loss of prey. This will help protect the Center and its members' enjoyment of and interests in the species and its habitat. The relief requested in this Complaint will also provide the Center and its members with the information and procedural rights to which they are entitled by law.

17.   Defendant ARMY CORPS OF ENGINEERS is a United States agency that regulates dredging activities in the navigable waters of the United States.  It is responsible for the Seattle Harbor Navigation Improvement Project. The Corps prepared the Environmental Assessment and Finding of No Significant Impact for the project. The Corps also consulted with the National Marine Fisheries Service to assess the risks that the project presents to the survival and recovery of endangered Southern Resident killer whales. The Corps is responsible for its compliance with federal environmental laws, including the Environmental Species Act, NEPA, and the APA.

18.   Defendant LIEUTENANT GENERAL SCOTT A. SPELLMON[1] is sued in his official capacity as the Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers. Lieutenant General Spellmon is the federal official with the ultimate authority and

---

[1] Defendant Lt. Gen. Scott A. Spellmon recently replaced Lt. Gen. Todd T. Semonite as the Chief of Engineers and Commanding General after Lt. Gen. Semonite retired.

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146; Seattle, WA 98117
(206) 900-7953

1   responsibility for ensuring the Corps' compliance with the law, including NEPA and Endangered

2   Species Act requirements, and he has authority to grant the relief requested in this complaint.

3        19.    Defendant WYNN COGGINS, Acting Agency Head, is the highest-ranking official

4   within the Department of Commerce and, in that capacity, has responsibility for its administration

5   and implementation of the Endangered Species Act, and for compliance with all other federal laws

6   applicable to the Department of Commerce. He is sued in his official capacity.

7        20.    Defendant NATIONAL MARINE FISHERIES SERVICE is an agency within the

8   Department of Commerce. The Fisheries Service is the agency that implements the Endangered

9   Species Act for most marine species, including Southern Resident killer whales.

10   **LEGAL BACKGROUND**

11   **ENDANGERED SPECIES ACT**

12        21.    With the Endangered Species Act, Congress intended endangered species to be

13   afforded the highest of priorities. The Endangered Species Act's purpose is "to provide a means

14   whereby the ecosystems upon which endangered species and threatened species depend may be

15   conserved, [and] to provide a program for the conservation of such endangered species and

16   threatened species." 16 U.S.C. § 1531(b).

17        22.    Under the Endangered Species Act, conservation means "to use and the use of all

18   methods and procedures which are necessary to bring any endangered species or threatened species

19   to the point at which the measures provided pursuant to this Act are no longer necessary." 16

20   U.S.C. § 1532(3).

21        23.    Section 7(a)(2) is a critical component of the statutory and regulatory scheme to

22   conserve endangered and threatened species. 16 U.S.C. § 1536(a)(2). It requires that every federal

23   agency determine whether its actions "may affect" any endangered species, threatened species, or

24   critical habitat as part of its duty to "insure that [its] action is . . . not likely to jeopardize the

continued existence" of that species or result in the destruction or adverse modification of their critical habitat. *Id*. § 1536; 50 C.F.R. § 402.14. The term "jeopardize" is defined as an action that "reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Endangered Species Act regulations allow for "informal consultation" if an agency determines its action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat, in which case there is no requirement for a biological opinion provided the Fisheries Service concurs in writing with the "not likely to adversely affect" determination. *Id*. § 402.13. A written request for concurrence with an action agency's "not likely to adversely affect" finding must "include information similar to the types of information described for formal consultation at § 402.14(c)(1) sufficient for the Service to determine if it concurs." *Id*. § 402.13(c)(1).

24.     Agencies must engage in "formal consultation" if the Fisheries Service does not concur with a "not likely to adversely affect" determination or if the action agency concludes its action is "likely to adversely affect" a listed species. 50 C.F.R. §§ 402.12, 402.14(a)–(b).

25.     In fulfilling the consultation process, agencies "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

26.     At the completion of formal consultation, the Fisheries Service issues a biological opinion that determines if the agency action is likely to jeopardize the species. 16 U.S.C. § 1536(b)(3)–(4); 50 C.F.R. § 402.14(h).

27.     A biological opinion must include a summary of the information upon which the opinion is based; an evaluation of "the current status and environmental baseline of the listed species or critical habitat;" "effects of the action;" and "cumulative effects on the listed species or critical habitat" 50 C.F.R. § 402.14(g)(1)–(3).

28.     The Endangered Species Act generally prohibits any person, including both private persons and federal agencies, from "taking" any endangered species, such as, in this case, Southern Resident killer whales. 16 U.S.C. § 1538(a)(1). The Endangered Species Act defines the term "take" as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id*. § 1532(19).

29.     A biological opinion must include an incidental take statement if the Fisheries Service concludes an agency action is not likely to jeopardize the continued existence of a listed species but is reasonably certain to result in take that is incidental to the agency action. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7). Absent a valid incidental take statement, the take of a listed species is unlawful under Section 9 of the Endangered Species Act. *See* 16 U.S.C. § 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i)(5).

30.     The incidental take statement must specify the amount or extent of incidental taking on such listed species, identify "reasonable and prudent measures that the [Fisheries Service] considers necessary or appropriate to minimize such impact," and set forth "terms and conditions" with which the action agency must comply to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i). Additionally, if marine mammals will be incidentally taken, the Fisheries Service must first authorize the take pursuant to the Marine Mammal Protection Act, and the incidental take statement must include any additional measures necessary to comply with that take authorization. *Id.*

31.     Federal agencies' Section 7(a)(2) obligations do not end with the completion of a biological opinion. After completion of consultation, the action and consulting agencies must review the ongoing impacts of the action and reinitiate consultation if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," among other triggering events. 50 C.F.R. § 402.16. Both the action agency

and the consulting agency have a duty to reinitiate consultation. *Id*. The Endangered Species Act specifies that consultation must typically be completed within ninety days of its initiation. 16 U.S.C. § 1536(b)(1); 50 C.F.R. § 402.14(e).

32.     Southern Resident killer whales are listed as endangered under the Endangered Species Act. 50 C.F.R. § 224.101.

**NATIONAL ENVIRONMENTAL POLICY ACT**

33.     NEPA is the nation's "basic national charter for protection of the environment," seeking to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(a)–(b) (2019).[2] "Ultimately . . . [t]he NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id*. § 1500.1(c).

34.     To reach these goals, federal agencies must prepare an Environmental Impact Statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

35.     The Council on Environmental Quality has promulgated regulations implementing NEPA, which are binding on all federal agencies. 40 C.F.R. § 1507.1.

36.     The regulations specify the factors an agency must consider in determining whether an action may significantly affect the environment and warrant preparation of an EIS. 40 C.F.R. § 1508.27. Specifically, whether an action may have "significant" impacts on the environment depends on the "context" and "intensity" of the action. *Id*. In considering the "context" of an action,

---

[2] All NEPA regulations cited herein reference the 2019 edition of the Code of Federal Regulations that was in effect when the Corps issued its Finding of No Significant Impact.

COMPLAINT
Case No. 2:21-CV-00275

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146; Seattle, WA 98117
(206) 900-7953

1    the significance "must be analyzed in several contexts such as society as a whole (human,

2    national), the affected region, the affected interests, and the locality." *Id*. § 1508.27(a).

3        37.    The "intensity" of an action is determined by considering ten factors enumerated in

4    the regulations: "(1) [i]mpacts that may be both beneficial and adverse[;] . . . (2) [t]he degree to

5    which the proposed action affects public health or safety[;] (3) [u]nique characteristics of the

6    geographic area such as proximity to historic or cultural resources, park lands, . . or ecologically

7    critical areas[;] (4) [t]he degree to which the effects on the human environment are likely to be

8    highly controversial[;] (5) [t]he degree to which the possible effects on the human environment

9    are highly uncertain or involve unique or unknown risks[;] (6) [t]he degree to which the action

10   may establish a precedent for future actions with significant effects[;] . . . (7) [w]hether the action

11   is related to other actions with individually insignificant but cumulatively significant impacts[;] . . .

12   (8) [t]he degree to which the action . . . may cause loss or destruction of significant scientific,

13   cultural, or historical resources[;] (9) [t]he degree to which the action may adversely affect" a

14   species listed under the Endangered Species Act or its designated critical habitat; and

15   "(10) [w]hether the action threatens a violation of federal, state, or local" environmental laws. 40

16   C.F.R. § 1508.27(b). The presence of just one of these factors is sufficient to require preparation

17   of an EIS.

18       38.    NEPA's regulations provide that an agency may first prepare an Environmental

19   Assessment to determine whether the environmental impact of a proposed action may be

20   "significant" and thus warrant preparation of an EIS. 40 C.F.R. §§ 1501.3, 1501.4(b)–(c). If,

21   pursuant to the Environmental Assessment, an agency determines that an EIS is not required, it

22   must issue a "Finding of No Significant Impact" that presents the reasons why the proposed agency

23   action will not have a significant impact on the human environment. *Id*. §§ 1501.4(e), 1508.13.

24

The Environmental Assessment must "provide sufficient evidence and analysis for determining whether" a Finding of No Significant Impact satisfies NEPA. *Id*. § 1508.9(a)(1).

39.     An agency may only issue a Finding of No Significant Impact for actions with no significant impact on the human environment. *See* 40 C.F.R. § 1508.13. If an action may have a significant effect on the environment, or if there are substantial questions as to whether it may, an EIS must be prepared. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3.

40.     Both Environmental Assessments and EISs must specify the purpose and need to which the agency is responding in proposing the action. 40 C.F.R. §§ 1502.13, 1508.9(b).

41.     Both Environmental Assessments and EISs must also "describe the environment of the areas to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15; *see id.* § 1508.9(b).

42.     Additionally, Environmental Assessments and EISs must discuss a proposed action's direct, indirect, and cumulative effects. 40 C.F.R. §§ 1502.16, 1508.9(b). Direct effects are "caused by the action and occur at the same time and place," whereas indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8. Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id*. § 1508.7.

43.     Environmental Assessment and EISs must also include a reasonable range of alternatives (42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. §§ 1502.14, 1508.9(b)), and provide "a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id*. § 1500.1(b).

**ADMINISTRATIVE PROCEDURE ACT**

44.     Judicial review of federal agency action is governed by the APA. 5 U.S.C. §§ 701–706.

45.     Under the APA, a person may seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

46.     Also, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

**FACTS**

**The Seattle Harbor Project**

47.     The Corps is undertaking a project to expand Seattle Harbor. The project includes deepening and widening the approaches and channels to facilitate larger ships calling on the port. At least one of the terminals also requires infrastructure development to accommodate the larger vessels.

48.     The Corps will dredge 1,112,000 cubic yards of material from the waterways over two years of construction. Various machines will be used during construction: a clamshell dredge, survey vessel, and tug barge; some will operate nearly continuously. The dredged material will be barged and dumped in Elliot Bay, except an estimated 245,000 cubic yards that requires special handling because of toxic or hazardous contaminants. A portion of the dredged material will be incidentally resuspended and pollute the water.

49.     The area affected by the proposed project is inhabited by endangered killer whales. The federal government designated critical habitat—habitat essential to conservation and recovery—for Southern Resident killer whales in the Salish Sea where they reside for most of the

year. The shipping lanes to the Seattle Harbor, the area for dumping dredged material in Elliott Bay, and the project area are within the Southern Resident killer whales' designated critical habitat.

50.    The Corps' Seattle Harbor Project is a major federal action triggering environmental review under NEPA. The Corps prepared an Integrated Feasibility Report and Environmental Assessment to analyze the project and evaluate its environmental effects.

51.    The Environmental Assessment considered a no action plan and two alternatives that include widening the approach and deepening the East and West waterways of Seattle Harbor to -56 feet or to -57 feet below mean lower low water. The Corps decided to deepen the East and West waterways of Seattle Harbor to 57 feet below mean lower low water.

52.    The project aims to enable larger ships to use Seattle Harbor and will facilitate more larger vessels calling upon the Port of Seattle.

53.    The Corps forecasted that vessel calls, imports, and exports will increase to the Port of Seattle between now and 2034.

54.    After reviewing the project, the Fisheries Service prepared a biological opinion under section 7 of the Endangered Species Act on February 2, 2017. The biological opinion concluded that the project may affect but is not likely to jeopardize the continued existence of threatened Puget Sound Chinook and Puget Sound steelhead or destroy or adversely modify their designated critical habitat. The biological opinion also contains the Fisheries Service's concurrence with the Corps' determination that the project is not likely to adversely affect Southern Resident killer whales or their critical habitat. The agencies did not engage in formal consultation regarding the impacts of the project on Southern Resident killer whales or their critical habitat.

55.    The agencies relied on the Fisheries Service's conclusion issued on December 17, 2015, that the continued use of dredge disposal sites in Puget Sound is not likely to adversely affect

Southern Resident killer whales or their critical habitat. The Fisheries Service included this determination in a biological opinion analyzing the impacts of the continued use of dredge disposal sites in Puget Sound on threatened Puget Sound Chinook and Puget Sound steelhead and their critical habitat.

56.     The Fisheries Service's 2017 "not likely to adversely affect" determination on the Seattle Harbor Project failed to consider the project's threats to Southern Resident killer whales from ship strikes, vessel noise and disturbance, and exposure to harmful contaminants.

57.     On March 27, 2019, the Corps found that the proposed project would not significantly affect the environment and determined that an EIS was not required.

58.     On September 1, 2020, the Center issued a Notice of Intent to Sue Letter (Notice) to the Corps and Fisheries Service for violations of the Endangered Species Act related to the Seattle Harbor Project. The Notice included 42 different scientific articles and reference documents demonstrating the numerous threats the project poses to critically endangered Southern Resident killer whales. The Corps subsequently determined that reinitiation of consultation was not required.

59.     Ongoing expansion projects at the West Waterway terminal (T-5)—including installing super post-Panamax container cranes, dock stabilization, and power infrastructure—will accommodate ultra-large containerships and increase container traffic capacity. Berth deepening in the East Waterway terminal (T-18) to accommodate ultra-large ships is in planning stages. Both the East and West Waterways will likely support the largest containerships serving the harbor.

60.     Vessel traffic is highly polluting, becoming a serious public health issue for areas with high volumes of traffic, like ports.

61. Ships pollute the air with smog, soot, and greenhouse gases. Vessels emit nitrogen oxides (NOx), sulfur oxides (SOx), volatile organic compounds (VOCs) particulate matter (PM), and greenhouse gases.

62. Smog contributes to asthma, emphysema, and pulmonary disease. Microscopic particles of PM from soot lodge deep in the lungs and can cause serious health problems, including heart attacks, aggravated asthma, and death. New studies also link PM exposure in people to increased risk of death from COVID-19.

63. Marine vessels are the second largest source of freight-related NOx and PM. Ports and adjacent neighborhoods are exposed to increased air pollution. Downwind of the project is a majority community of color that will be exposed to air pollution.

64. The Corps neither conducted an analysis of air emissions dispersal nor assessed the environmental, health, or environmental justice effects associated with the project.

**Southern Resident Killer Whales**

65. Southern Resident killer whales, also known as orcas, are charismatic black and white marine mammals that are an icon of the Pacific Northwest. They are intelligent, social animals that live in highly organized groups known as pods. These killer whales form strong social bonds and have been observed sharing the responsibilities of caring for the young, sick, and injured. Southern Resident killer whales are distinct from other killer whales. They are residents of the Salish Sea and communicate with calls and whistles unique to each pod. Their diet consists entirely of fish, primarily Chinook salmon.

66. Southern Resident killer whales were listed as endangered in 2005, and their population has declined precipitously. The species is at grave risk of extinction, with only 74 Southern Residents killer whales remaining. Scientists, local and federal officials, and the public are alarmed by the precarious status of these iconic killer whales.

67.     Given the low abundance and continuing population decline of Southern Resident killer whales, the health and survival of every single individual affects the conservation of the species.

68.     According to the Fisheries Service, the loss of a single individual, or the decrease in reproductive capacity of a single individual, is likely to appreciably reduce the likelihood of survival and recovery of the Southern Resident killer whales.

69.     In November 2006, the Fisheries Service issued a final rule designating approximately 2,560 square miles (6,630 square km) of inland waters of Washington State as critical habitat for Southern Resident killer whales. 71 Fed. Reg. 69,054 (Nov. 29, 2006). The critical habitat's identified features include (among other things) prey species of sufficient quantity, quality, and availability to support individual growth, reproduction, and development, as well as overall population growth.

70.     Salmon are clearly the preferred prey of Southern Resident killer whales and consumed in large amounts. In addition to needing a great quantity of salmon, those salmon must not contain an amount of contaminants that exceed levels that can cause mortality or reproductive failure in Southern Resident killer whales.

71.     The Fisheries Service identified Southern Resident killer whales as a "Species in the Spotlight." This means that the agency considers the whales to be one of a few species most at risk of extinction and a number one priority for recovery.

72.     The Fisheries Service also has identified three primary threats to Southern Residents: (1) starvation from lack of prey; (2) vessel noise and disturbance that interrupt foraging and other behaviors; and (3) toxic contaminants that bioaccumulate and are stored in the whales' fat.

1    **The Seattle Harbor Project Threatens Southern Resident Killer Whales**

2          73.    The Corps' Seattle Harbor Project contributes to each of the three primary threats

3    to Southern Resident killer whales. First, the construction, dredging noise, and sediment plume

4    degrades salmon habitat with adverse impacts on killer whale prey. Second, the dredging, larger

5    ships, and growing number of ships and tending vessels will add noise pollution in the Salish Sea

6    that can harass killer whales and impair their foraging. Third, the dredging will disturb hazardous

7    sediments and resuspend contaminants, such as PCBs, from toxic sites, exposing Southern

8    Residents and their habitat to increased contamination.

9          74.    **Prey availability:** Eight stocks of salmonids inhabit the proposed action area,

10   including some that must migrate through the harbor to reach spawning grounds. Among these

11   salmonids are several imperiled populations protected under the Endangered Species Act,

12   including Puget Sound Chinook—preferred prey for Southern Resident killer whales.

13         75.    Salmon are endangered in large part because of habitat degradation from dredging,

14   construction, and dams. Dredging noise and turbidity can impair salmon spawning success and

15   timing and damage habitat. The construction will take place during the threatened Puget Sound

16   Chinook run.

17         76.    Nonetheless, the Corps concluded that its project would have no or negligible

18   impacts on salmonids (or their availability as killer whale prey), reasoning that adult salmon can

19   "easily swim around" the dredge operation without delays in spawning.

20         77.    **Vessel disturbance:** Ships calling on Seattle Harbor travel through critical habitat

21   of Southern Resident killer whales. When the Fisheries Service designated critical habitat in 2006,

22   it found that vessel traffic will require special management.

23

24

78.     In 2015, the Port of Tacoma joined with the Port of Seattle in an operating partnership, the Northwest Seaport Alliance. Combined, the ports are the third largest in North America by container volume.

79.     Shipping traffic and noise threatens endangered Southern resident killer whales. Disturbance from vessels impairs the behavior and feeding of Southern Resident killer whales by increasing expended energy, reducing effectiveness of their hunting techniques, and reducing the time they spend foraging. Killer whales use sound and echolocation to find prey; noise pollution can mask the clicks that they use to locate prey. Ship noise overlaps with the same frequencies that Southern Residents use. Marine species with high site fidelity (i.e., animals that stay in or habitually return to a particular area), such as Southern Resident killer whales, are especially vulnerable to noise.

80.     But for the project, large shipping vessels will be unable to use Seattle Harbor. The project will facilitate an increase in shipping traffic of large vessels crossing Haro Strait and transiting through the Salish Sea. Larger ships have larger positioning thrusters and propulsion units and may need tending vessels, such as tugboats, to guide them to port. Shipping vessels and tugboats contribute significantly to noise in the Salish Sea. The dredging and disposal will require vessel transit.

81.     Neither the Corps nor the Fisheries Service analyzed the environmental impacts of noise and disturbance from Salish Sea vessel traffic that the project will cause. Neither the Environmental Assessment, the not-likely-to-adversely-affect determination for Southern Resident killer whales, nor the biological opinion forecasted, modeled, or quantified noise pollution from the increase in larger ships or vessel calls. The Corps did not use the Fisheries Service's technical guidance for assessing the effects of anthropogenic sound on marine mammal hearing, and it did not use any other method to estimate noise impacts to Southern Residents or

their critical habitat. Neither the Corps nor the Fisheries Service quantified the harms of noise pollution, vessel collisions, or oil spills.

82.     Documented ship strikes of Southern Resident killer whales include one collision in 2005 with an unknown individual that resulted in injury; the fatal collision of L98, a seven-year-old male, in 2006; and the 2016 fatal collision of J34, an 18-year-old male.

83.     Without discussing these incidents, the Corps and Fisheries Service concluded that the increased risk to Southern Resident killer whales of collision from a large vessel is discountable. The agencies did not evaluate the likelihood of take from other threats, provide a limit on take of Southern Resident killer whales, or include measures to mitigate the impacts of such take on this highly imperiled population.

84.     The Environmental Assessment failed to take a hard look at the noise pollution and sediment plume from dredging. Dredging, including clamshell dredging, produces underwater noise that is audible to Southern Resident killer whales and other wildlife. The dredging ship and vessel towing dredged material for dumping in Elliot Bay also produce underwater noise.

85.     In a similar harbor expansion for the Port of Miami, the Corps severely underestimated impacts and area of damage from dredging that killed a half-million corals. The Corps settled litigation over the issue with coral mitigation and other restoration.

86.     For this project, the Corps and Fisheries Service concluded that there are no effects to killer whales from vessel noise. They also determined that risks of vessel strikes are discountable and contamination harms were negligible. Ultimately, the Corps and Fisheries Service found negligible impacts to Southern Resident killer whales and their critical habitat from the project.

87.     **Contamination:** Exposure to contaminants threatens Southern Resident killer whales. Persistent organic pollutants, such as PCBs and DDT, have been found in high levels in the animals. They are primarily exposed to these contaminants from the prey they consume.

Starving killer whales burn fat reserves that release toxins with harmful effects. Deleterious health effects from contaminants for killer whales include poor reproductive success, impaired growth or development, and neurological and foraging problems.

88.     The project threatens killer whales through contamination. The project area has two Superfund sites that are contaminated with hazardous and toxic wastes. Contaminated sediments will be dredged as part of the proposed project, resulting in resuspension of some contaminants, including persistent organic pollutants, in the water. For example, the Corps estimates a resuspension rate of up to five percent of PCBs with increased bioavailability for two years. This would expose salmon and killer whales to this toxic pollutant.

89.     The Fisheries Service incorrectly concluded that killer whales are not likely to be found in the area affected by water quality disturbances. The Fisheries Service therefore failed to consider adequately the impacts of PCBs on Southern Resident killer whales by exposure though the prey they consume.

90.     In making its Finding of No Significant Impact from contaminants, the Corps relied on speculative future plans to clean up contaminated Superfund sites.

91.     **Cumulative impacts**: The Corps has proposed an expansion of Tacoma Harbor, and it issued a draft Environmental Assessment for deepening and widening Tacoma Harbor to facilitate larger ships. The Corps did not evaluate the cumulative impacts of the Seattle and Tacoma harbor expansions.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (Violation of the Endangered Species Act and APA)

92.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs of this Complaint.

1    93.    The Fisheries Service's concurrence that the Seattle Harbor Project is not likely to

2  adversely affect Southern Resident killer whales or destroy or adversely modify their critical

3  habitat is a final agency action within the meaning of the APA.

4    94.    The Fisheries Service's 2017 determination that the Seattle Harbor Project is not

5  likely to adversely affect endangered Southern Resident killer whales or their critical habitat is

6  arbitrary, capricious, contrary to law, and invalid. 5 U.S.C. § 706(2)(A), (D). The Fisheries

7  Service's determination is not based on the best scientific and commercial data available. The

8  Fisheries Service ignored relevant factors and failed to analyze and develop projections based on

9  information and methodology that was available, in violation of the Endangered Species Act and

10  the APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14; 5 U.S.C. § 706(2)(A), (D).

11    95.    Any extent to which the Fisheries Service relied on its 2015 determination to make

12  its 2017 determination that found the disposal of dredged material is not likely to adversely affect

13  endangered Southern Resident killer whales or their critical habitat is improper because the 2015

14  determination is arbitrary, capricious, contrary to law, and invalid. 5 U.S.C. § 706(2)(A), (D). The

15  Fisheries Service's determination is not based on the best scientific and commercial data available.

16  The Fisheries Service ignored relevant factors and failed to analyze and develop projections based

17  on information and methodology that was available, in violation of the Endangered Species Act

18  and the APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14; 5 U.S.C. § 706(2)(A), (D).

19    96.    Because the Fisheries Service concurred with the Corps' "not likely to adversely

20  affect" determination for Southern Resident killer whales, it did not engage in formal consultation

21  for this species and failed to properly determine whether the action, in combination with the

22  environmental baseline and cumulative effects, will jeopardize the species or adversely modify its

23  critical habitat, in violation of the Endangered Species Act and the APA. 16 U.S.C. § 1536(a)(2);

24  50 C.F.R. §§ 402.12, 402.14; 5 U.S.C. § 706(2)(A). Additionally, the Fisheries Service failed to

1    prepare an incidental take statement that would have required that impacts to the species be

2    minimized through mandatory terms and conditions, and which would have included monitoring

3    and reporting requirements. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.

4                                    **SECOND CLAIM FOR RELIEF**

5                          **(Violation of the Endangered Species Act and APA)**

6         97.    Plaintiff realleges and incorporates the allegations in the preceding paragraphs of

7    this Complaint.

8         98.    The Corps unlawfully relied on the Fisheries Service's flawed concurrence. By

9    relying on the Fisheries Service's legally flawed determination that the project is not likely to

10   adversely affect Southern Resident killer whales or their critical habitat, the Corps is failing to

11   ensure that the Seattle Harbor Project is not likely to jeopardize the continued existence of

12   Southern Resident killer whales or result in the destruction or adverse modification of their critical

13   habitat in violation of Section 7(a)(2) of the Endangered Species Act. 16 U.S.C. § 1536(a)(2).

14                                    **THIRD CLAIM FOR RELIEF**

15                              **(Violations of NEPA and the APA)**

16        99.    Plaintiff realleges and incorporates the allegations in the preceding paragraphs of

17   this Complaint.

18        100.   The Corps' Seattle Harbor Project is a major federal action within the meaning of

19   NEPA.

20        101.   The Corps' Environmental Assessment and Finding of No Significant Impact are

21   inadequate under NEPA because the agency failed to take a "hard look" at the direct, indirect, and

22   cumulative environmental impacts of its decision before acting. The Corps failed to include

23   sufficient evidence and adequate analysis of the environmental impacts of the project to support

24   its ultimate no-significant-impact conclusion.

102.    The Environmental Assessment violates NEPA's requirement that the Corps consider a reasonable range of alternatives to the action. In this case, the agency considered just three alternatives, two that were substantially the same, without evaluating reasonable alternatives that would mitigate effects of the action in violation of NEPA.

103.    The Environmental Assessment and Finding of No Significant Impact are arbitrary, capricious, an abuse of discretion, made without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, 42 U.S.C. § 4332(2)(C), D; 40 C.F.R. §§ 1502.14, 1508.7, 1508.8, 1508.9, in violation of the APA. 5 U.S.C. § 706(2).

<strong>FOURTH CLAIM FOR RELIEF</strong>

<strong>(Violations of NEPA and the APA)</strong>

104.    Plaintiff realleges and incorporates the allegations in the preceding paragraphs of this Complaint.

105.    The Corps violated NEPA because it failed to prepare an EIS fully analyzing the environmental impacts of the Seattle Harbor Project including impacts on Southern Resident killer whales and on public health and environmental justice due to air emission increases. The agency's decision implicates several NEPA significance factors for when an EIS is required: it may have adverse impacts; it may affect geographically unique areas; it involves highly uncertain or unique or unknown risks; it has cumulatively significant impacts; it may cause loss or destruction of significant scientific, cultural, or historical resources; and it may adversely affect threatened or endangered species or their critical habitat. 40 C.F.R. § 1508.27.

106.    The Corps' failure to prepare an EIS constitutes an agency action unlawfully withheld or unreasonably delayed, in violation of the APA. 5 U.S.C. § 706(1). Alternatively, the Corps' authorization of the Seattle Harbor Project without first preparing an EIS is arbitrary,

capricious, an abuse of discretion, made without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, in violation of the APA. *Id.* § 706(2).

## FIFTH CLAIM FOR RELIEF

### (Violation of the Endangered Species Act and APA)

107.    Plaintiff realleges and incorporates the allegations in the preceding paragraphs of this Complaint.

108.    The Corps and the Fisheries Service have failed to reinitiate and complete consultation on the impacts of the Seattle Harbor Project on Southern Resident killer whales and their critical habitat. This violates Section 7 of the Endangered Species Act and its implementing regulations. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14, 402.16.

109.    The Corps determined that reinitiation of consultation was not required. The refusal to reinitiate consultation on the impacts of the Seattle Harbor Project despite new evidence of impacts to Southern Resident killer whales constitutes arbitrary and capricious agency action, agency action "unlawfully withheld or unreasonably delayed," and/or agency action made "without observance of procedure required by law" under the APA. 5 U.S.C. § 706(1), 706(2)(A), (D).

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

1.    Declare that the Fisheries Service has violated and is violating the Endangered Species Act, its implementing regulations, and the APA by determining the project is not likely to adversely affect Southern Resident killer whales or their critical habitat;

2.      Declare that the Corps has violated and is violating the Endangered Species Act and its implementing regulations by relying on the Fisheries Service's unlawful not-likely-to-adversely-affect determination;

3.      Declare that the Corps' Environmental Assessment and Finding of No Significant Impact violate NEPA, its implementing regulations, and the APA;

4.      Declare that the Corps' failure to prepare an EIS violates NEPA, its implementing regulations, and the APA;

5.      Declare that the Corps and the Fisheries Service have violated and continue to violate the Endangered Species Act and its implementing regulations by failing to reinitiate and complete consultation to ensure that the Seattle Harbor Project does not jeopardize the continued existence of Southern Resident killer whales or result in the destruction or adverse modification of their critical habitat;

6.      Set aside and vacate the Fisheries Service's not-likely-to-adversely-affect concurrence for Southern Resident killer whales;

7.      Set aside and vacate the Environmental Assessment and Finding of No Significant Impact the Corps issued for the project;

8.      Order the Fisheries Service to reinitiate consultation within 30 days and complete a biological opinion analyzing impacts to Southern Resident killer whales in compliance with the Endangered Species Act;

9.      Order the Corps to prepare an EIS in compliance with NEPA;

10.     Award Plaintiff the costs of this action, including reasonable attorneys' fees; and

11.     Grant such other relief as this Court deems just and proper.

COMPLAINT
Case No. 2:21-CV-00275

CENTER FOR BIOLOGICAL DIVERSITY
2400 NW 80th St. #146; Seattle, WA 98117
(206) 900-7953

1     Respectfully submitted March 4, 2021,

2                             By: *s/ Sophia N. Ressler*

3                             Sophia N. Ressler (WA Bar No. 48406)
                             CENTER FOR BIOLOGICAL DIVERSITY
4                             2400 NW 80th Street, #146
                            Seattle, WA 98117
5                             Phone: (206) 900-7953
                            sressler@biologicaldiversity.org

6

7                             Catherine W. Kilduff (VA Bar No. 89727)
                            CENTER FOR BIOLOGICAL DIVERSITY
8                             801 Boush St., Ste. 200
                            Norfolk, VA 23510
9                             Phone: (202) 780-8862
                            ckilduff@biologicaldiversity.org
                            *Pro hac vice pending*

10

11                             Cari Miyoko Sakashita (CA Bar No. 239639)
                            CENTER FOR BIOLOGICAL DIVERSITY
12                            1212 Broadway, St. #800
                            Oakland, CA 94612
13                             Phone: (510) 844-7100
                            Facsimile: (510) 844-7150
                            miyoko@biologicaldiversity.org
14                             *Pro hac vice pending*

15                             *Attorneys for Plaintiff*
                            *Center for Biological Diversity*

16

17

18

19

20

21

22

23

24

COMPLAINT
Case No. 2:21-CV-00275

                                    CENTER FOR BIOLOGICAL DIVERSITY
                                    2400 NW 80th St. #146; Seattle, WA 98117
27                                  (206) 900-7953